1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                 **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   CHRISTOPHER LEE OUTLEY,              No. CIV S-06-2271-MCE-CMK-P

12                    Plaintiff,

13         vs.                           <u>FINDINGS AND RECOMMENDATIONS</u>

14   GLENN N. JAMES,

15                    Defendant.

16   _____/

17              Plaintiff, a state prisoner proceeding pro se, brings this civil rights action pursuant

18   to 42 U.S.C. § 1983.  Pending before the court are:  (1) defendant's motion for summary

19   judgment (Doc. 45); (2) plaintiff's motion for summary judgment (Doc. 52); and (3) plaintiff's

20   motion for injunctive relief (Doc. 58).

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

1

# I. BACKGROUND

### A.   Plaintiff's Claim

This action currently proceeds on the original complaint (Doc. 1), filed on October 16, 2006. Plaintiff names Glenn N. James, M.D., a prison doctor, as the only defendant. Plaintiff states that, on October 23, 2005, he injured his right middle finger and was taken to the Central Treatment Center for emergency medical treatment. Plaintiff alleges that defendant "observed" his finger and "informed plaintiff that the plaintiff's injured finger was just dislocated." He states that defendant then grabbed his injured finger and "began pulling the plaintiff's injured finger hard without any anesthesia." According to plaintiff, defendant then administered two injections of lidocaine into the injured finger, one on the left side of the finger, and one on the right side. Plaintiff states that, after the injections, his finger became numb and defendant again pulled the injured finger.

Plaintiff alleges that, the following day, he reported to the medical technician that his finger was swollen and was causing him extreme pain. Plaintiff states that the medical technician said that, because it was the weekend, he would have to wait until Monday. On Monday plaintiff was escorted back to the Central Treatment Center, where an x-ray was taken. The x-ray technician informed plaintiff that he had a "50% dislocation with a fracture." Plaintiff was then seen again by defendant. Plaintiff states that defendant said "What did you do? I thought I had put it back in place." He told defendant that he had not done anything to his finger. According to plaintiff, defendant then repeated the lidocaine injection procedure. Plaintiff states that defendant then grabbed and pulled his injured finger extremely hard until he "felt and heard his injured finger tear and snap." Plaintiff was then taken for more x-rays. Plaintiff claims that defendant then told the x-ray technician: "This time make the x-rays look right." Defendant then replaced the splint on plaintiff's injured finger.

/ / /

/ / /

1    Despite reporting continuing pain and swelling, plaintiff was not seen again by

2 any medical personnel until three weeks later when he was seen by defendant.  Plaintiff alleges

3 that, at this visit, defendant "only looked at the plaintiff's injured finger."  Following all of this,

4 plaintiff filed an inmate grievance "claiming medical negligence on the part of defendant James."

5 According to plaintiff, after he filed the grievance he was taken to Northern Nevada Medical

6 Center where surgery was performed on plaintiff's finger.  Plaintiff states:

7    . . . [The surgeon] informed the plaintiff that if the plaintiff would
     have been seen . . . a month earlier he would have been able to repair the
8     plaintiff's injured finger so that the plaintiff would be able to bend
     plaintiff's finger again, but since the plaintiff was seen after a whole
9     month had past [sic] by, [the surgeon] would not be able to repair
     plaintiff's injured finger so that it would be able to bend.
10

11 Plaintiff states that another surgery was performed nine months later and that prison medical

12 officials were instructed to remove the sutures at a later date.  According to plaintiff, that date has

13 past and the sutures have not been removed and that the "skin has grown over the sutures within

14 the plaintiff's injured finger."

15    This action proceeds on a claim of deliberate indifference in violation of the

16 Eighth Amendment.  Specifically, in the court's December 12, 2006, order determining that

17 service of the complaint on defendant was appropriate, the court described the claim as follows:

18    At first blush, it would seem that the gravamen of
     plaintiff's complaint is a claim based on professional negligence, which
19     would not be cognizable in an action under § 1983.  The court notes,
     however, plaintiff's allegation that, after the injection procedure at the
20     second examination, defendant told the x-ray technician to "make the x-
     rays look right."  If true, this suggests that defendant knew that the pulling
21     and injection procedure would have no effect and that it was up to the x-
     ray technician to cover up by somehow manipulating the x-ray image to
22     show that plaintiff's finger had, in fact, been effectively treated.  This in
     turn suggests an improper motive behind defendant's pulling and injection
23     procedure, perhaps even the desire to inflict pain.

24 / / /

25 / / /

26 / / /

3

1

    **B.**    <u>**Plaintiff's Deposition**</u>

2

        Regarding plaintiff's initial treatment by defendant, plaintiff testified as follows:

3

            Q:    What happened when you got there?

4

            A:    They sent me to the emergency room, set me on the table, and the MTA or RN, whatever she is, Drake, she came in and Dr. James came in and he saw [the finger] and he was like, oh, that is dislocated.  He said I have to put that back in place, and he went to pull it, and he tried to pull it and I said hey, main, hold up, man, because he was pulling on it and it wasn't doing anything.

5

6

         So the two officers that escorted me over there, one of them said we might have to tie him down.  I said no, you ain't going to do that, but they were just joking, though.

7

8

         So [defendant] went to the cabinet and got the lubricant and shot me on this side and this side of my finger and then when it was numb he proceeded to do what he do, and he said it was back inside, and he took me to the cast room and put a little hand splint right here and warmed up and wrapped it and sent me back to the yard.

9

10

11

12

As to the second visit with defendant, plaintiff testified:

13

            A:    [Defendant] asked me what did you do.  He asked me what did I do to my finger.  I said what do you mean?  I went home and elevated it, that is what I did.

14

         He said I could have swore I put it in place yesterday.  He said I have to try to put the thing back in place.

15

         So he go get the needle and he proceeded to do the same thing he did the first time.  He shot me up again on both sides of my hand and he went to pull it again.

16

17

            Q:    Okay.

18

            A:    You know, pulling and twisting and he said he couldn't get a grip so he went and got a towel and Carpenter said, oh, that don't look right.

19

20

            Q:    Who said that?

21

            A:    [Correctional officer] Carpenter.  He said that don't look right.  He got on the phone and said this is Carpenter, I'm over here with the inmate I escorted over, we might have to take him to the outside hospital.

22

23

         Dr. James was pulling it and twisting it and then he said, oh, it's back in place and then he told the [x-ray technician] to give me some more x-rays and this time make it look right.  I don't know what he meant, but the [x-ray technician] said, oh, yeah, okay.  Well, John Doe, I mean, he said yeah, it's back in the socket.

24

25

26

1    According to plaintiff, he never saw the second x-ray.  Plaintiff also testified that he ultimately

2    required reconstructive surgery on his finger.

3              Regarding the basis of his claim, plaintiff testified:

4              Q:      I'm trying to establish exactly what the theories are,
        because you filed a complaint for deliberate indifference?

5

6              A:      Yes, sir.

7              Q:      But your position is that [defendant] was
        negligent?

8              A:      Yes.

9              Q:      He committed malpractice in that sense?

10             A:      Yes.  [¶] Like I said, time had elapsed and the damage is
        irreversible.  It's something I have to live with and I don't want to be filing

11       paperwork and all this, you know.

12                     *  *  *

13             Q:      And in count two [of the complaint] you mention the
        pulling of your finger [by defendant] without administering any

14       anesthesia?

15             A:      Yes, when he first grabbed it.

16             Q:      Okay.  [¶] Count three you say that Defendant James
        maliciously and purposefully and deliberately injected lidocaine.  What do

17       you mean by that?

18             A:      The second time he knew that it was fractured, you know
        what I'm saying.  It was dislocated.  He should have just sent me to the –

19

20             Q:      But specifically the lidocaine, didn't he administer that in
        order to numb your finger?

21             A:      Yes, sir, the first time.

22             Q:      Okay.  [¶] That is on October 23rd, 2005?

23             A:      Yes, sir.

24             Count four looks like it might be a repeat of count three.  You talk
        about that Dr. James maliciously, purposely, and deliberately pulled your

25       finger and then informed you that your finger was fixed and the swelling
        would go down; is that correct?

26

1        A:     That's correct.

2        Q:     Okay.  [¶] And then count five is again a claim for deliberate indifference talking about when you had your finger x-rayed it was discovered that your finger had a bone fracture and lidocaine was then injected inside the plaintiff's injured finger; is that correct?

       A:     Yes, sir.

       * * *

       Q:     So what you're saying essentially is that your disagreement with Dr. James has to do with –

       A:     The manner.

       Q:     Let me finish my question for the court reporter.  [¶] That essentially you're disagreeing with Dr. James is, first of all, the diagnosis, he gave you the wrong diagnosis of your finger.  Number two, he didn't treat your finger properly; is that correct?

       A:     That's correct.

Plaintiff offered no additional testimony concerning defendants' alleged statement to the x-ray technician to "make the x-ray look right."  In particular, plaintiff never offered this alleged statement as a basis for his claim of deliberate indifference.

**C.**    **Defendant's Declaration**

       Defendant's statement of undisputed facts is based on portions of the complaint, plaintiff's deposition testimony, and his own declaration and exhibits attached thereto.  In his declaration, defendant states:

    1.     He was plaintiff's primary care physician;

    2.     He examined plaintiff on October 23, 2005, and concluded that he had dislocated his finger and that a fracture of the bone needed to be ruled out;

    3.     Defendant treated plaintiff by numbing his finger with injections of 1% zylocaine solution, then reducing the dislocation, and then placing a plaster splint on the finger;

    4.     He prescribed pain medication and ordered an x-ray;

    5.     He treated plaintiff again and observed that, while the splint was still in place, the finger was again dislocated;

/ / /

6.     On the second examination, defendant noted calcification consistent with bone fragments near the joint;

7.     A second x-ray was taken;

8.     Defendant repeated the injection/reduction procedure in an attempt to correct the dislocation;

9.     Defendant examined plaintiff's finger again on November 16, 2005, at which time he noted a fracture dislocation and residual partial subluxation with rotation;

10.    Defendant then requested that plaintiff be permitted to see an outside hand surgeon within two to three weeks;

11.    The medical records reflect that plaintiff was taken to see a specialist in Reno, Nevada, on November 21, 2005, and that surgery took place on November 23, 2005;

12.    Plaintiff underwent further surgeries on his finger on August 17, 2006, and March 12, 2007;

13.    Defendant treated plaintiff consistent with the community standards of care and the degree of knowledge and skill ordinarily possessed and exercised by members of his profession; and

14.    Defendant never denied or intended to deny plaintiff necessary medical treatment.

The court notes that, as to the factual statements in the declaration, defendants indicates that they are based on a review of records and not on his own personal knowledge.  Specifically, defendant states:

> I make this declaration based on my recollection of reviewing Mr. Outley's medical records and Mr. Outley's complaint and all exhibits to that complaint, including all attached 602 administrative appeals. . . .

He does, however, declare under penalty of perjury that the matters stated in his declaration are true and correct.

Defendant makes no reference in his declaration to the statement plaintiff alleges he made to the x-ray technician upon ordering the second x-ray to the effect of "make the x-ray look right."  In particular, he neither confirms nor denies having made any such statement.

/ / /

## II.  APPLICABLE LEGAL STANDARDS

### A.   Summary Judgment

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

> Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the

dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

/ / /

1        **B.**     <u>**Injunctive Relief**</u>

2          The legal principles applicable to requests for injunctive relief, such as a

3 temporary restraining order or preliminary injunction, are well established.  To prevail, the

4 moving party must show either a likelihood of success on the merits of the underlying

5 controversy and the possibility of irreparable injury, or that serious questions are raised and the

6 balance of hardships tips sharply in the movant's favor.  <u>See</u> <u>Coalition for Economic Equity v.</u>

7 <u>Wilson</u>, 122 F.3d 692, 700 (9th Cir. 1997); <u>Oakland Tribune, Inc. v. Chronicle Publ'g Co.</u>, 762

8 F.2d 1374, 1376 (9th Cir. 1985).  The two formulations represent two points on a sliding scale

9 with the focal point being the degree of irreparable injury shown.  <u>See</u> <u>Oakland Tribune</u>, 762

10 F.2d at 1376.  Under any formulation of the test, however, the moving party must demonstrate

11 that there exists a significant threat of irreparable injury.  <u>See</u> <u>id.</u>  In the absence of a significant

12 showing of possible irreparable harm, the court need not reach the issue of likelihood of success

13 on the merits.  <u>See</u> <u>id.</u>  The loss of money, or an injury whose measure of damages can be

14 calculated in terms of money, will not be considered irreparable.  <u>See</u> <u>id.</u> at 1334-35.

15          The standard for a temporary restraining order is essentially the same.  The

16 purpose in issuing a temporary restraining order is to preserve the status quo pending a more

17 complete hearing.  The cases contain limited discussion of the standards for issuing a temporary

18 restraining order due to the fact that very few such orders can be appealed prior to the hearing on

19 a preliminary injunction.  It is apparent however, that requests for temporary restraining orders

20 are governed by the same general standards that govern the issuance of a preliminary injunction.

21 <u>See</u> <u>New Motor Vehicle Bd. v. Orrin W. Fox Co.</u>, 434 U.S. 1345, 1347 n.2 (1977) (Rehnquist,

22 J.); <u>Los Angeles Unified Sch. Dist. v. United States Dist. Court</u>, 650 F.2d 1004, 1008 (9th Cir.

23 1981) (Ferguson, J. dissenting); <u>Century Time Ltd. v. Interchron Ltd.</u>, 729 F. Supp. 366, 368

24 (S.D.N.Y. 1990).  In many cases the emphasis of the court is directed to irreparable harm and the

25 balance of hardships because the merits of a controversy are often difficult to ascertain and

26 adjudicate on short notice.

Eastern District of California Local Rules impose additional requirements for a motion for a temporary restraining order.  First, the court will consider whether the moving party could have sought relief by a noticed motion for a preliminary injunction at an earlier date without the necessity of seeking last-minute relief by motion for a temporary restraining order.  See Local Rule 65-231(b).  Second, the moving party must provide specific documents to the court in support of the requested temporary restraining order.  See Local Rule 65-231(c).

In cases brought by prisoners involving conditions of confinement, any temporary restraining order or preliminary injunction must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct the harm.  See 18 U.S.C. § 3626(a)(2).  Finally, where a prisoner is seeking injunctive relief with respect to conditions of confinement, the prisoner's transfer to another prison renders the request for injunctive relief moot, unless there is some evidence of an expectation of being transferred back.  See Prieser v. Newkirk, 422 U.S. 395, 402-03 (1975); Johnson v. Moore, 948 F.3d 517, 519 (9th Cir. 1991) (per curiam).

## III.  DISCUSSION

As discussed above, this case presents a single claim of deliberate indifference in violation of the Eighth Amendment.  The treatment a prisoner receives in prison and the conditions under which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994).  The Eighth Amendment ". . . embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102 (1976).  Conditions of confinement may, however, be harsh and restrictive.  See Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official

11

1   violates the Eighth Amendment only when two requirements are met: (1) objectively, the

2   official's act or omission must be so serious such that it results in the denial of the minimal

3   civilized measure of life's necessities; and (2) subjectively, the prison official must have acted

4   unnecessarily and wantonly for the purpose of inflicting harm.  See Farmer, 511 U.S. at 834.

5   Thus, to violate the Eighth Amendment, a prison official must have a "sufficiently culpable

6   mind."  See id.

7             When prison officials stand accused of using excessive force, the core judicial

8   inquiry is ". . . whether force was applied in a good-faith effort to maintain or restore discipline,

9   or maliciously and sadistically to cause harm."  Hudson v. McMillian, 503 U.S. 1, 6-7 (1992);

10   Whitley v. Albers, 475 U.S. 312, 320-21 (1986).  The "malicious and sadistic" standard, as

11   opposed to the "deliberate indifference" standard applicable to most Eighth Amendment claims,

12   is applied to excessive force claims because prison officials generally do not have time to reflect

13   on their actions in the face of risk of injury to inmates or prison employees.  See Whitley, 475

14   U.S. at 320-21.  In determining whether force was excessive, the court considers the following

15   factors: (1) the need for application of force; (2) the extent of injuries; (3) the relationship

16   between the need for force and the amount of force used; (4) the nature of the threat reasonably

17   perceived by prison officers; and (5) efforts made to temper the severity of a forceful response.

18   See Hudson, 503 U.S. at 7.  The absence of an emergency situation is probative of whether force

19   was applied maliciously or sadistically.  See Jordan v. Gardner, 986 F.2d 1521, 1528 (9th Cir.

20   1993) (en banc).  The lack of injuries is also probative.  See Hudson, 503 U.S. at 7-9.  Finally,

21   because the use of force relates to the prison's legitimate penological interest in maintaining

22   security and order, the court must be deferential to the conduct of prison officials.  See Whitley,

23   475 U.S. at 321-22.

24   / / /

25   / / /

26   / / /

1          Deliberate indifference to a prisoner's serious illness or injury, or risks of serious

2   injury or illness, also gives rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at

3   105; see also Farmer, 511 U.S. at 837.  This applies to physical as well as dental and mental

4   health needs.  See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982).  An injury or illness is

5   sufficiently serious if the failure to treat a prisoner's condition could result in further significant

6   injury or the ". . . unnecessary and wanton infliction of pain."  McGuckin v. Smith, 974 F.2d

7   1050, 1059 (9th Cir. 1992); see also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994).

8   Factors indicating seriousness are: (1) whether a reasonable doctor would think that the condition

9   is worthy of comment; (2) whether the condition significantly impacts the prisoner's daily

10  activities; and (3) whether the condition is chronic and accompanied by substantial pain.  See

11  Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000) (en banc).

12         The requirement of deliberate indifference is less stringent in medical needs cases

13  than in other Eighth Amendment contexts because the responsibility to provide inmates with

14  medical care does not generally conflict with competing penological concerns.  See McGuckin,

15  974 F.2d at 1060.  Thus, deference need not be given to the judgment of prison officials as to

16  decisions concerning medical needs.  See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir.

17  1989).  The complete denial of medical attention may constitute deliberate indifference.  See

18  Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986).  Delay in providing medical

19  treatment, or interference with medical treatment, may also constitute deliberate indifference.

20  See Lopez, 203 F.3d at 1131.  Where delay is alleged, however, the prisoner must also

21  demonstrate that the delay led to further injury.  See McGuckin, 974 F.2d at 1060.

22         Negligence in diagnosing or treating a medical condition does not, however, give

23  rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 106.  Moreover, a

24  difference of opinion between the prisoner and medical providers concerning the appropriate

25  course of treatment does not give rise to an Eighth Amendment claim.  See Jackson v. McIntosh,

26  90 F.3d 330, 332 (9th Cir. 1996).

1        In his motion for summary judgment, defendant argues:

2             Defendant is entitled to summary judgment as there is no evidence
that he consciously or deliberately ignored or refused plaintiff any

3        necessary medical treatment.  The evidence is entirely to the contrary.

4                            * * *

5             Defendant's treatment of plaintiff was at all times within the
community standard of care and consistent with the degree of knowledge

6        and skill ordinarily possessed and exercised by members of [defendant's]
profession under similar circumstances.  Plaintiff can present no

7        competent or admissible evidence that Defendant ever refused or denied
him appropriate medical treatment or evaluation.

8             What exists here . . . is a difference in medical opinion between a
prisoner-patient and a healthcare provider in treatment options, which does

9        not give rise to an Eighth Amendment claim.  (citation omitted).  Here,
plaintiff was seen, evaluated, and treated by Dr. James for all of his

10      complaints.

11  In his opposition, plaintiff asserts that defendant made an improper and incorrect diagnosis.  He

12  also claims that defendant is liable because he "allowed time to elapse without proving [sic]

13  plaintiff with prompt adequate medical treatment by an Orthopedic specialist" and that

14  "Defendant James' failure to timely set plaintiff [sic] fracture [sic] finger is what caused plaintiff

15  to suffer a disability from his injury. . . ."  As to defendant's treatment with the

16  injection/reduction procedure, plaintiff argues that defendant was deliberately indifferent by not

17  reviewing x-rays before performing the procedure.

18        The court agrees with defendant's assessment of plaintiff's claim in this case.  As

19  revealed by plaintiff at his deposition, his claim is based on medical malpractice and/or a

20  difference of opinion regarding the proper course of treatment.  In particular, when asked about

21  the bases of his claim, plaintiff never mentioned at his deposition the statement defendant James

22  allegedly made to the x-ray technician to the effect of "make the x-ray look right."  Instead, he

23  confirmed that his claim was based on alleged malpractice and disagreement with defendant's

24  course of treatment.  Thus, the court concludes that the allegation identified in the December 12,

25  2006, order regarding the statement defendant allegedly made to the x-ray technician as a

26  possible basis for deliberate indifference is not actually part of plaintiff's claim in this case.  This

1  conclusion is supported by plaintiff's opposition in which he outlines the bases for his claim and

2  never mentions the alleged statement.

3          Further, the undisputed facts clearly demonstrate that defendant was not

4  deliberately indifferent.  In particular, the record reveals that defendant treated plaintiff the same

5  day as his injury by examining the injured finger, obtaining x-rays, and attempting to correct the

6  dislocation.  Defendant then examined and treated plaintiff one or two days later.  Plaintiff was

7  provided pain medication, a splint, and instructions for the care of his finger.  When plaintiff

8  returned to defendant on November 16, 2005, complaining of pain, defendant examined plaintiff

9  again and determined that a referral to an outside specialist was warranted.  Based on these facts,

10  it is clear that defendant never refused to provide medical treatment.

11          As to plaintiff's assertion that defendant was deliberately indifferent with respect

12  to delaying plaintiff's treatment by an outside specialist, there is simply no factual basis for such

13  a claim.  The documents submitted by both defendant and plaintiff indicate that plaintiff was

14  seen by an outside specialist less than one month following the initial injury and that surgery was

15  first performed only two days after plaintiff's initial consultation with the outside specialist.

16  Specifically, plaintiff injured his finger on October 23, 2005, and he was treated by defendant

17  that same day and one or two days later.  Defendant performed a follow-up examination on

18  November 16, 2005, at which time he referred plaintiff to an outside specialist for further

19  evaluation and treatment.  Plaintiff was seen by the outside specialist on November 21st and

20  surgery was performed on November 23rd.  These facts do not indicate any delay, let alone delay

21  which would rise to the level of an Eighth Amendment violation.

22          Because the court finds that summary judgment in defendant's favor is

23  appropriate, plaintiff's motions for summary judgment and injunctive relief should be denied.

24  / / /

25  / / /

26  / / /

1

**IV.  CONCLUSION**

2

Based on the foregoing, the undersigned recommends that:

3

1.      Defendant's motion for summary judgment (Doc. 45) be granted;

4

2.      Plaintiff's motion for summary judgment (Doc. 52) be denied;

5

3.      Plaintiff's motion for injunctive relief (Doc. 58) be denied; and

6

4.      The Clerk of the Court be directed to enter judgment in favor of defendant

7

and close this file.

8

These findings and recommendations are submitted to the United States District

9

Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days

10

after being served with these findings and recommendations, any party may file written

11

objections with the court.  The document should be captioned "Objections to Magistrate Judge's

12

Findings and Recommendations."  Failure to file objections within the specified time may waive

13

the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

14

15

DATED:  June 27, 2008

16

17

CRAIG M. KELLISON
UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26